IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
**Roanoke Division**

| | |
|---|---|
| RICHARD ADAM BEARD, *on behalf of himself and all similarly situated individuals,* | : : : |
| Plaintiff, | : : |
| v. | :  Civil Action No. __7:21CV00201__ : |
| TRANSUNION RENTAL SCREENING SOLUTIONS, INC., | : : : |
| Defendant. | : : |

## CLASS ACTION COMPLAINT

Plaintiff, Richard Adam Beard, by counsel, on behalf of himself and all similarly situated individuals, brings the following Complaint against the Defendant TransUnion Rental Screening Solutions, Inc. ("TURSS"). In support of his Complaint, he alleges as follows:

### INTRODUCTION

1. When enacting the Fair Credit Reporting Act, Congress found that consumer reporting agencies "have assumed a vital role" in and there was a need to ensure that they "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S. Code § 1681(a)(3)-(4). To accomplish Congress' goal, the FCRA contains a variety of requirements to protect consumers, including § 1681e(b), which is one of the cornerstone provisions of the statute.

2. Whenever a consumer reporting agency prepares a consumer report, § 1681e(b) requires it to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. § 1681e(b). This

1

section imposes a high, and often disregarded, standard on credit reporting agencies. *See, e.g., Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b), and explaining that " 'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

3. This case arises because TURSS uses overly broad criteria in response to its customers' requests for tenant screening reports. In this instance, TURSS provided Plaintiff's potential landlord with a grossly inaccurate report stating that Plaintiff was listed on the National Sex Offender Registry for use communications system to contact a minor. TURSS matched this criminal information to Plaintiff even though it knew that the Plaintiff had a different middle name and date of birth than the offender.

4. Defendant's inaccurate reporting could have been easily prevented if it required a first name, middle name, last name, and date of birth match—a common procedure adopted by consumer reporting agencies. *See* Nat'l Consumer Law Ctr., *Broken Records*, 15 (2012) (explaining that "mismatched reports" are "due in large part to unsophisticated matching criteria" and that "many private screening companies rely solely on first name, last name, and date of birth.").

5. By systematically allowing criminal records to be attributed to consumers who had different middle names and/or date of births than the registered sex offender, Defendant failed to maintain reasonable procedures to assure maximum possible accuracy. Because the putative class

2

members were subject to the same procedure and suffered the same overarching harm, this case is capable and appropriate for class resolution.

## JURISDICTION

6. The Court has jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in this judicial district.

## **PARTIES**

8. Plaintiff is a natural person and a "consumer" as defined and governed by the FCRA, 15 U.S.C. § 1681a(c).

9. TURSS is a Delaware corporation doing business throughout the United States, including in the State of Maryland, and has a principal place of business located at 5889 South Greenwood Plaza Boulevard, Suite 201, Greenwood Village, CO 80111.

10. TURSS is a wholly-owned subsidiary of TransUnion, LLC, which is wholly owned by TransUnion Intermediate Holdings, Inc.

## FACTS

**A.  The FCRA's Protections for Housing Applicants.**

11. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting. It regulates all consumer reports such as the tenant screening report prepared in Plaintiff's name.

12. Background checks, including tenant screening reports, are "consumer reports," and providers of background checks like TURSS are "consumer reporting agencies" governed by the FCRA. 15 U.S.C. §§ 1681a(d), (f).

3

13. The FCRA provides a number of protections for housing applicants who are subject to background checks.

14. The FCRA imposes duties on consumer reporting agencies to ensure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

15. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

### B. Pervasive Errors in Criminal Background Checks.

16. Although no comprehensive study focusing on the accuracy of criminal record reports industrywide, several recent studies demonstrate the prevalence of major inaccuracies in criminal background reports. For example, a 2013 study by the National Employment Law Project examined criminal background checks conducted by the FBI. Nat'l Employment Law Project, *Wanted: Accurate FBI Background Checks for Employment* (July 30, 2013), available at www.nelp.org/publication/wanted-accurate-fbi-background-checks-for-employ-ment/.

17. Although "considered the gold standard" of criminal background checks, the NELP study found that "50 percent of the FBI's records fail to include information on the final disposition of the case" including "missing information [] frequently beneficial to job seekers." *Id*.

18. Similar to the NELP's survey, the National Association of State Public Interest Research conducted a study regarding error rates in consumer reports. This study concluded that "79% of the credit reports contained either serious errors or other mistakes of some kind." *Id*.; *see also* Federal Trade Commission, Report to Congress Concerning the Accuracy of Information in Credit Reports (Dec. 2012).

19. Beyond the risks raised by the sheer volume of the information and players involved in the industry, the manner in which many companies prepare criminal history reports increases the risk of inaccuracies. Companies often purchase criminal data in bulk and in static form, or access databases that are infrequently updated.

20. "Despite the importance of the accuracy of criminal background report, evidence indicates that professional background screening companies routinely make mistakes with grave consequences" for applicants. *See* Nat'l Consumer Law Ctr., *Broken Records*, available at http://www.nclc.org/images/pdf/pr-reprts/broken-records-report.pdf.

21. Online background check companies sell criminal history reports that contain inaccurate information.

22. One "common problem with criminal background reports is false positive matches or mismatched identifications," resulting in a mismatched report that contains "the criminal history of a person other than the subject of the report." *Id*. at 15.

23. A mismatch report is "due in large part to unsophisticated matching criteria." *Id*.

24. Unlike "state-maintained databases" that use a "biometric identification system, such as fingerprint data," to match a person to a record, private companies typically use "non-biometric information, such as name and date of birth." *Id*.

25. Because many courts will not release social security numbers, many private companies "rely solely on first name, last name, and date of birth," which "poses significant trouble for people with common names." *Id*.; *see also Smith v. E-Backgroundchecks.com, Inc.*, 81 F. Supp. 3d 1342, 1360 (N.D. Ga. 2015) (denying a background company's motion for summary judgment, including its argument that "[r]eporting records that match complete names and dates of birth is a

procedure reasonably designed to assure maximum possible accuracy, and is considered industry best-practice.").

26. The problem is significantly magnified where, as here, a company does not require a full match of the full name and date of birth.

    **C.    Facts Regarding the Plaintiff's Experience.**

27. On August 5, 2020, Plaintiff applied to rent an apartment and, as part of the application process, Plaintiff was required to undergo a background report.

28. In order for his landlord to obtain his background report, Plaintiff provided his full name, social security number, and date of birth.

29. Plaintiff's landlord ordered Plaintiff's background report from TURSS. In requesting Plaintiff's background report, the Plaintiff's potential landlord provided TURSS with all of Plaintiff's personal identifying information.

30. TURSS provided Plaintiff's background report on August 5, 2020.

31. TURSS's report provided to Plaintiff's potential landlord was grossly inaccurate.

32. The report stated that Plaintiff was listed on the National Sex Offender Registry as a registered sex offender in Virginia for attempted for use of communications systems to contact a minor child.

33. This entry does not belong to the Plaintiff.

34. Plaintiff is not a registered sex offender in any jurisdiction, nor had he ever been charged with the crime on TURSS's report.

35. In fact, Plaintiff has no criminal history and honorably served his country for over 18 years in the Marine Corps.

36. TURSS knew or should have known that this information did not belong to the Plaintiff because it did not match the personal identifying information that Plaintiff's potential landlord provided to TURSS when it requested Plaintiff's report.

37. For example, the sex offender's middle name is Gary.

38. Plaintiff's middle name is Adam.

39. In addition, the sex offender's date of birth is December 30, 1953.

40. Plaintiff was born on November 17, 1977.

**C.  Allegations Regarding TURSS's Willfulness.**

41. TURSS violated the FCRA by using overly broad criteria in response to its customers' requests for tenant screening reports.

42. TURSS matched this criminal information to Plaintiff even though the underlying records unequivocally indicated that the offender's middle name was Gary, not Adam. In addition, Plaintiff was born on November 17, 1977, not December 30, 1953.

43. TURSS's inaccurate reporting could have been easily prevented if it required a middle name or date of birth match prior to the publication of its reports—a common procedure adopted by consumer reporting agencies. *See* Nat'l Consumer Law Ctr., *Broken Records*, 15 (2012) (explaining that "mismatched reports" are "due in large part to unsophisticated matching criteria" and that "many private screening companies rely solely on first name, last name, and date of birth."); *E-Backgroundchecks.com*, 81 F. Supp. 3d at 1360 (discussing credit reporting agency's contention that use of first name, last name, and date of birth "is considered industry best-practice.").

44. Rather than adopting these procedures to ensure maximum accuracy, however, TURSS intentionally designed its matching procedures to loosely capture potential records based on a potential name match alone.

45. TURSS has been sued many times for its failure to use reasonable procedures to assure that the rental-purposed consumer reports it sells are maximally accurate. TURSS knows that its process for obtaining and accurately reporting, updating, and investigating criminal public records is so shoddy that it leads to material inaccuracies. TURSS's parent company, TransUnion, has been admonished by at least one federal court that it doesn't comply with the FCRA.

46. Among many other cases, for instance, a jury recently returned a verdict in favor of plaintiffs against TransUnion for its failure to use reasonable procedures to assure maximum possible accuracy in erroneously reporting that the plaintiffs in that case were terrorists, money launderers, and narcotics traffickers on the Office of Foreign Asset Control's "blocked persons" list. *Ramirez v. TransUnion, LLC*, No. 3:13CV632 (N.D. Cal.).

47. The injuries suffered by Plaintiff as a direct result of TURSS's erroneous reporting are the type of injuries that the FCRA was enacted to address. At common law, TURSS's conduct would have given rise to causes of action based on defamation and invasion of privacy.

48. As a direct result of TURSS's conduct, Plaintiff has suffered these injuries resulting in damages, including the inability to rent the unit he desired, the expenditure of time and money looking for another unit and trying to correct TURSS's erroneous Report; damage to his reputation; physical injury as a result of emotional distress; damage to his relationship with his wife; loss of sleep; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, frustration, humiliation, and embarrassment; and other losses that are continuing in nature.

49. In addition to the conduct set forth above, TURSS's willful conduct is further reflected by, inter alia, the following:

   a. The FCRA was enacted in 1970; TURSS has had nearly many years to become compliant;

   b. TURSS is a corporation with access to legal advice through its own general counsel's office and outside employment counsel. Yet, there is no contemporaneous evidence that it determined that its conduct was lawful;

   c. TURSS knew or had reason to know that its conduct was inconsistent with FTC guidance, case law, and the plain language of the FCRA;

   d. TURSS voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless; and

   e. TURSS's violations of the FCRA were repeated and systematic.

50. At all times relevant hereto, TURSS's conduct was willful and carried out in knowing or reckless disregard for consumers' rights under the FCRA. TURSS's conduct was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that TURSS and other consumer reporting agencies have been subject to court decisions critical of similar conduct; and TURSS will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports and hiding information from consumers.

## COUNT I – FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681e(b)
## Class Claim

51. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

52. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for himself and on behalf of a class (the "Date of Birth Class") defined as follows:

> All natural persons residing in the United States (a) who were the subject of a report sold by Defendant TURSS; (b) in the five years predating the filing of this Complaint and continuing through the date which the class list is prepared; (c) which identified the applicant has being listed on a sex offender registry; (d) despite the fact that the sex offender's date of birth did not match the applicant's date of birth.
>
> Excluded from the class definition are any employees, officers, directors of TURSS, any attorney appearing in this case, and any judge assigned to hear this action.

53. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action for himself and on behalf of a class (the "Middle Name Class") defined as follows:

> All natural persons residing in the United States (a) who were the subject of a report sold by TURSS; (b) in the five years predating the filing of this Complaint and continuing through the date which the class list is prepared; (c) which identified the applicant has being listed on a sex offender registry; (d) despite the fact that the sex offender's middle name did not match that of the sex offender.
>
> Excluded from the class definition are any employees, officers, directors of TURSS, any attorney appearing in this case, and any judge assigned to hear this action.

54. **Numerosity. Fed. R. Civ. P 23(a)(1).** Plaintiff estimates that the class is so numerous that joinder of all members is impractical. The class members' names and addresses are identifiable through documents maintained by TURSS and the class members may be notified of the pendency of this action by published and/or mailed notice.

55. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These common questions

predominate over the questions affecting only individual class members. The common questions include: (1.) whether TURSS's failure to require date of birth and middle name matches for sex offender records was a procedure designed to ensure that its reports were as accurate as possible; (2.) whether TURSS's conduct constituted a violation of the FCRA; and (3.) whether TURSS's conduct was willful.

56. **Typicality**. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of each putative class member. Plaintiff is entitled to relief under the same causes of action as the other putative class members. Additionally, Plaintiff's claims are based on the same facts and legal theories as each of the class members' claims.

57. **Adequacy of Representation**. Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the other putative class members. Plaintiff has retained counsel competent and experienced in such litigation and intends, with his counsel, to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the class members' interests. Neither Plaintiff nor his counsel have any interest that might conflict with his vigorous pursuit of this action.

58. **Superiority**. Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation

presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by TURSS's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

59. As described above, Defendant TURSS used loose matching criteria and algorithms that placed sex offender data on consumers' tenant screening reports, even though the middle name and dates of birth associated with the sex offenders did not match that of the applicants.

60. This conduct violated § 1681e(b) of the FCRA because in using this loose matching criteria and algorithms, TURSS failed to follow reasonable procedures to assure the maximum possible accuracy of the information it that it published about consumers to its landlord clients.

61. Plaintiffs and each putative class member suffered real and actual harm and injury.

62. For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in TURSS's files and reports.

63. Class members were also falsely painted as sex offenders to their prospective landlord.

64. TURSS's conduct was willful, rendering it liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, the violation was negligent, rendering Equifax liable under 15 U.S.C. § 1681o.[1]

---

[1] Plaintiff seeks statutory and punitive damages on behalf of himself and others. If class certification is denied, Plaintiff intends to seek actual damages for Defendant TURSS's violation.

65. As a result of these FCRA violations, Equifax is liable for statutory damages from $100.00 to $1,000.00 for Plaintiff and each class member, punitive damages, attorney's fees, and costs pursuant to 15 U.S.C. § 1681n.

WHEREFORE, Plaintiff, on behalf of himself and the putative class members, moves for class certification and for statutory and punitive damages, as well as his attorney's fees and costs against the Defendant for the class claim, as well as actual, statutory, and punitive damages and attorney's fees and costs for his individual claim; for pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
**RICHARD ADAM BEARD**

By:_____/s/ Kristi C. Kelly_____
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
*Counsel for Plaintiff*